```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------- x
JOHN B. OHLE III,                    :
                                     :        13 Civ. 450(JSR)
            Petitioner,              :        08 Cr. 1109(JSR)
                                     :
            -v-                                  MEMORANDUM ORDER

UNITED STATES OF AMERICA,

            Respondent.
---------------------------
JED S. RAKOFF, U.S.D.J.
```

On June 2, 2010, John B. Ohle III, represented by counsel

Stuart Abrams, was convicted by a jury of one count of

conspiracy to commit wire fraud and two counts of tax evasion

for the years 2001 and 2002, respectively. The Court, after

holding a Fatico hearing and denying Ohle's motion for new trial

based on the Government's late disclosure of certain documents,

sentenced Ohle to 60 months' imprisonment, substantially below

the applicable Guidelines range of 180 months. On appeal, the

Second Circuit affirmed Ohle's conviction and sentence. See

United States v. Ohle, 441 F. App'x 798 (2d Cir. 2011). Ohle now

moves pursuant to 28 U.S.C. § 2255 to vacate his sentence and

conviction, alleging that he was deprived of his Sixth Amendment

right to counsel.

Ohle's criminal case had a somewhat bumpy procedural

history, recounted in the Court's ruling on Ohle's motion for

new trial. See United States v. Ohle, No. 08 Cr. 1109, 2011 WL

651849 (S.D.N.Y. Feb. 7, 2011). The collateral proceedings have been no smoother. Ohle initially filed a pro se motion to vacate his sentence, which he was permitted to withdraw after he retained counsel. That counsel then filed a new motion to vacate and a memorandum of law in support. Two months later, counsel filed a supplemental memorandum of law. Complications between Ohle and his counsel led to the substitution of present counsel, who has since filed three supplemental briefs in support (one of which the Court rejected for non-compliance with the Court's Individual Rules); a reply brief; a motion for discovery and memorandum of law in support that, in effect, operates as yet another supplemental brief; and a reply brief in support of the motion for discovery. Ohle has also received an assist from his wife and certain entities, who have moved to set aside the forfeiture order in this case. Their brief, much like Ohle's motion for discovery, mirrors the arguments made in support of Ohle's habeas motion and, in fact, incorporates by reference the entirety of Ohle's papers. But a pile of papers cannot transform weak arguments into winning ones, and in the end the Court concludes that it must deny Ohle's motion.

The Court begins with a brief recitation of the evidence adduced at trial. Ohle, an attorney and certified public accountant, worked in the Innovative Strategies Group at Bank

2

One in the early 2000s and assisted in Bank One's offering of a tax shelter known as "Hedged Option Monetization of Economic Remainder," or "HOMER." Trial Transcript ("Trial Tr.") at 1768:22-1769:14. Bank One developed HOMER with Jenkens & Gilchrist ("J & G"), a now defunct law-firm. See, e.g. id. at 67:4-8. Clients who entered into a HOMER tax shelter agreed to pay a fee of as much as 6% of the tax loss they sought to generate. Id. at 90:17; 1409:9-12; 1734:17. That fee was then split among J & G, Bank One, a so-called third-party purchaser, and others. Id. at 90:19-91:2. The Government presented evidence showing that Bank One was entitled to a fee of 1.8%, less any amounts paid to reimburse the expenses of third-parties who helped bring in HOMER clients. Id. at 94:4-5; 388:22-24; 1068:4-13. The Court will refer to these latter amounts as "referral fees."

The third-party purchaser (to be distinguished from third-parties who received "referral fees") also received a fee. Ohle recruited a childhood friend, Ken Brown, to act as this third-party purchaser and agreed to provide Brown with the funds necessary to make the purchases. Trial Tr. at 530:16-532:25. In return, Ohle required Brown to split the fee he received 50-50 with Ohle. Id. at 532:5-6. Brown and Ohle did not disclose this

fee-splitting arrangement, as Bank One's code of conduct
prohibited Ohle from such side payments. Id. at 534:15-17.

     The next step in Ohle's scheme was securing the funds for
Brown. For this task, he convinced a trust client, Ecetra Ames,
to invest $7,000,000 in Carpe Diem, a hedge fund for which
Ohle's acquaintance, Douglas Steger, worked as a salesman. Id.
at 679:16-680-24; 785:8-15. Without telling Ames, Ohle and
Steger took out a $350,000 "commission" from her investment. Id.
at 1005:3-5. Through a series of transfers, $300,000 of this
money ended up in accounts operated by Brown, who used the money
for the HOMER transactions, and by Ohle, who used the money for
personal expenses. Id. at 1963:6-1965-16. Ohle later took out
additional amounts from the Ames trust and, after a few
preliminary transfers, maneuvered the funds to his and Brown's
respective accounts. Id. at 465:13-468:22; 540:13-541:5. Later,
Ohle resorted to simply embezzling from the Ames trust for his
own benefit. Id. at 467:3-7.

     With all the pieces to support HOMER in place, Ohle then
set out to obtain the so-called referral fees. Ohle worked with
Steger and Ohle's co-defendant, William Bradley, to submit false
invoices listing expenses incurred in the supposed recruitment
of nine HOMER clients. See, e.g., GX 2-37 (invoice of $64,125
for "services rendered in connection with the David Ducote [a

4

HOMER client] matter"). The invoices were sent from Bradley's
law firm or Steger's company, American Capital Financial. Ohle,
as a Bank One employee, was forbidden from receiving these fees,
even if they had been legitimate. But in fact neither Steger
nor Bradley performed any actual work and the invoices were
entirely false. See, e.g. Trial Tr. at 174010-19; 207:15-20;
1105:19-1106:6. J & G paid a total of $1,256,000 in false
invoices, all of which, the evidence at trial showed, would have
otherwise gone to Bank One. Id. at 1027:5-11.

The final aspect of the conduct supporting Ohle's
convictions involved his tax evasion activities. In 2001, Ohle
failed to report over $2,000,000 in (unlawful) income related to
the referral fees he diverted from Bank One and the amounts he
took from the Ames trust. Id. at 1627:5-15; 1988:2-24. In 2002,
Ohle both failed to report certain income and also entered into
what is known as a "1256" or "major minor" tax shelter with
knowledge of its illegality. The shelter was structured in a way
that it falsely inflated the participant's risk of loss to
reduce his or her taxable income, see, e.g., id. at 1630:7-1632-
21, and the Government presented evidence demonstrating that
Ohle had knowledge of a "secret arrangement put into place by
the architects of the transaction" that allowed the shelter to

operate in this manner. Memorandum of Law of United States in Opposition to Petitioner John B. Ohle III's Motion to Vacate, Set Aside, and Correct Sentence Under 28 U.S.C. § 2255 ("Gov. Opp. Br."), ECF Dkt. No. 13, at 19; Trial Tr. at 1511:25-1512:3 (testimony of John Kruse).

On the basis of this quite overwhelming evidence, the jury convicted Ohle on all Counts. Just prior to the argument of his appeal, Ohle learned that Abrams, his trial attorney, was suffering from cancer. Ten days after oral argument of the appeal and sixteen months after the trial, Abrams passed away.

Against that background, the Court turns to the merits of Ohle's motion. The parties and the Court all agree that Abrams was a seasoned, well-respected, and highly capable trial attorney. So far as the Court was able to observe at trial, Abrams presented a vigorous, skillful, and zealous defense, well superior to what this Court normally sees from all but the most superb counsel. Nonetheless, Ohle contends that the cancer that led to Abrams' death "created a series of insurmountable problems for Abrams leading to his ineffective assistance." Petitioner Ohle's Condensed Supplemental Brief Regarding New Evidence Supporting Petitioner's 2255 Claims ("Def.'s Condensed Supp. Br."), ECF Dkt. No. 46, at 3.

6

"Claims of ineffective assistance based on attorney illness," however, are not afforded special treatment but are subject to the same "fact-specific prejudice inquiry mandated by Strickland." Bellamy v. Cogdell, 974 F.2d 302, 308 (2d Cir. 1992). Accordingly, to establish ineffective assistance of counsel, Ohle must satisfy the familiar two-prong test set forth in Strickland v. Washington, 466 U.S. 668 (1984).

First, Ohle must "demonstrate that his counsel's performance 'fell below an objective standard of reasonableness' in light of 'prevailing professional norms.'" United States v. Cohen, 427 F.3d 164, 167 (2d Cir. 2005) (quoting Strickland, 466 U.S. at 688). Courts apply a "strong presumption" that defense counsel's representation was within "the wide range of reasonable professional assistance." Strickland, 466 U.S. at 689. While "reasonable professional assistance" encompasses a duty to either make a reasonable investigation or to make a reasonable decision that makes a particular investigation unnecessary, see Lindstadt v. Keane, 239 F.3d 191, 200 (2d Cir. 2001), that duty does not require counsel to "conduct a comprehensive investigation of every possible lead or defense or . . . scour the globe on the off-chance something will turn up." United States v. Eppolito, 436 F. Supp. 2d 532, 562

7

(E.D.N.Y. 2006) (internal quotation marks and citations omitted).

Second, Ohle must "'affirmatively prove prejudice' arising from counsel's allegedly deficient representation." Cohen, 427 F.3d at 167 (quoting Strickland, 466 U.S. at 693). Prejudice exists where there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Pham v. United States, 317 F.3d 178, 182 (2d Cir. 2003) (citing Strickland, 466 U.S. at 688, 694).

Ohle's first habeas counsel raised six specific grounds for relief. His second counsel, though purporting to work within that framework, advances a host of additional alleged bases for finding ineffective assistance of counsel. The Court deals with each.

The Court turns first to Ohle's arguments related to the issue of whether Ohle defrauded Bank One of its property when he directed others to submit the "bogus" invoices and received the "referral fees" therefrom. This was hotly disputed at trial and on appeal because the Government, in order to enjoy the benefit of a ten-year statute of limitations, had to prove that Bank One (a financial institution) was the "victim" of the conspiracy.

8

In order to establish that the "referral fees" were Bank One's property, the Government presented the following evidence. Through Sandra Burnside, a legal assistant at J & G responsible for keeping track of clients involved in HOMER transactions, the Government introduced a spreadsheet that reflected the amount initially attributed to Bank One as a fee on each HOMER transaction. See GX 2-42. In each instance, this amount constituted a 1.8% fee. The Government also introduced through Burnside a second spreadsheet that showed the actual amounts paid by J & G to Bank One after all referral fees had been paid. See GX 2-43. For transactions not involving the payment of referral fees, Bank One actually received a 1.8% fee; for each transaction for which Ohle's cohorts submitted false invoices, the difference between the amount due to Bank One on the first spreadsheet and the amount received by Bank One on the second spreadsheet "equaled exactly or almost exactly the amount of the bogus invoices." Brief for the United States of America, United States v. Ohle, at *40, 441 F. App'x 798 (2d Cir. 2011) (No. 11-393), 2011 WL 4047537; GX 2-32 – GX 2-40. To corroborate this data, the Government offered testimony from Paul Ferguson, a Bank One employee, who stated that referral fees reduced Bank One's share. Trial Tr. at 94:4-5. The conclusion that the jury drew from all this, and that the Second Circuit found sufficient

9

when it upheld Ohle's conviction, was that, in the absence of
referral fees, Bank One would have enjoyed a full 1.8% fee and
that Ohle's fraud therefore deprived Bank One of property to
which it otherwise would have been entitled.

Ohle offers six reasons why Abrams' efforts to rebut the
Government's theory that the referral fees deprived Bank One of
property were deficient and prejudicial.

First, Ohle argues that Abrams failed to conduct an
adequate investigation into the division of fees among the
participants in the HOMER transaction. Specifically, according
to Ohle, Abrams should have (1) subpoenaed Bank One and J & G
for documents related to the fee issue, (2) subpoenaed the
notebook of Vicky Little, a colleague of Ohle's who was present
at meetings where Bank One's fees were addressed, (3) subpoenaed
a PowerPoint presentation about fee division related to HOMER
that was created by Harry "Trey" Dye, Ohle's supervisor at Bank
One, (4) subpoenaed J & G for records related to Paul Daugerdas,
who led J & G's HOMER-related practice, (5) interviewed Little,
Dye, and Bank One's in-house counsel, (6) interviewed various J
& G witnesses familiar with HOMER, and (7) conducted a more
thorough review of the materials that the Government produced
during discovery. See Memorandum of Law in Support of
Defendant's Motion Pursuant to 28 U.S.C. § 2255 to Vacate His

10

Sentence and Judgment of Conviction ("Def.'s Br."), ECF Dkt. No. 4, at 14-15.

The answer to the first and last of these contentions is that "conclusory assertions are insufficient to establish ineffective assistance of counsel." Williams v. United States, No. 00 Cr. 1008, 2011 WL 3296101, at *15 (S.D.N.Y. July 28, 2011) (collecting cases). Contrary to Ohle's assertion, Abrams did issue a trial subpoena to Bank One, and Ohle offers no explanation of what else he expects that Abrams could have uncovered. See Gov. Opp. Br. at 33. As for J & G, the Government turned over to Ohle the fruits of its own broad subpoena to J & G. Id. Here, too, Abrams' performance did not fall below prevailing professional norms because he declined to issue an additional and likely redundant subpoena.

Likewise, Ohle's conclusory assertion that Abrams failed to adequately review discovery cannot carry Ohle's burden. Although the substance of Ohle's prior motion for new trial -- which treated as "new" evidence certain documents that had already been produced -- might raise an inference that Abrams failed to review every single page of the millions of pages of discovery before trial, the Court assumed arguendo in its analysis of the prior motion that the documents had not been produced at all and determined that Ohle still suffered no prejudice from the

11

Government's (hypothetical) non-disclosure. See Ohle, 2011 WL 651849, at *5. That conclusion is not altered by the fact that Ohle now presents his claim as a violation of his right to effective assistance rather than (as previously) as a Brady violation. To prevail here, then, Ohle must point to other specific documents (beyond those covered by the prior motion) that he contends Abrams should have, but did not, review and explain how he suffered prejudice from that omission. In the few instances that Ohle has done so, the Court addresses his claims below, but his more general, conclusory accusation will not support his motion.

As for Abrams' alleged failure to investigate specific individuals or their work product, the record amply demonstrates both that Abrams' course of investigation was strategic and that, even if one assumes arguendo that it was not, Ohle suffered no prejudice from the failure to pursue these purported "leads." For example, with respect to Little, she testified in front of the Grand Jury that any referral fees that J & G paid were deducted from Bank One's fee. See Davis Decl., Ex. 6, at 27:22-25. This is precisely the opposite of what Ohle needed to establish at trial. Likewise, though Ohle places considerable emphasis on notes from the IRS's interview of Dye that reflect that Dye "believe[d]" that Bank One had only received a 1% fee

12

for certain HOMER transactions, see Davis Decl., Ex. 4, ¶ 26,
Dye's understanding would carry little weight when viewed
against the hard evidence that the Government introduced at
trial showing that the fee amounts initially attributed to Bank
One (shown in J & G's spreadsheet) differed from the amounts
Bank One received (shown in both J & G's spreadsheet and in Bank
One records) by an amount that matched the amounts in the false
invoices submitted by Ohle and his confederates.[1] Moreover,
whatever minimal benefit Ohle may have received from Dye's
conjectural testimony would have been vastly outweighed by the
substantially prejudicial information that the Government could

_____

[1] Ohle also makes much of the fact that the Court, before
allowing the Government to use a chart during its rebuttal
summation that illustrated that Bank One received a 1.8% fee on
each transaction for which there were no referral fees, inquired
whether "there were in evidence or defense counsel knows of
Homer transactions where there was no referral fee where the
bank received less than 1.8 percent." Trial Tr. 2186:1-7.
According to Ohle, by failing to mention Dye's statement, Abrams
rendered constitutionally ineffective assistance and the
Government violated Ohle's due process rights and deceived the
Court. These accusations are not well taken. The fact that Dye
said that he "believed" that Bank One consistently received 1%
on certain transactions does not mean that there was actual
evidence of Bank One receiving that amount, and in fact, to this
day, Ohle has not come forward with any such evidence. The chart
that the Government presented during its rebuttal summation
shows that, on the majority of the transactions that involved
false referral fees, Bank One received .8% or 1.3%; only on a
single transaction did it receive 1%. See Reply Memorandum of
Law in Further Support of Movants' Motion to Set Aside
Forfeiture and for Return of Property, United States v. Ohle, 08
Cr. 1109, Dkt. No. 267, Ex. 1.

have elicited from Dye on cross-examination, including, among
other things, that Ohle had participated in an entirely separate
fraud that led to his dismissal from Bank One. See Declaration
of Nanette L. Davis in Support of Memorandum of Law of United
States in Opposition to Petitioner John B. Ohle III's Motion to
Vacate, Set Aside, and Correct Sentence Under 28 U.S.C. § 2255
("Davis Decl."), ECF Dkt. No. 14, Ex. 4, ¶ 37.

    As to the in-house counsel, Abrams secured a stipulation
regarding the role of one of Bank One's in-house lawyers, John
Kramer, and he also called Kramer at the Fatico hearing. The
Court has little trouble concluding that Abrams' decision to not
expend additional time and resources on Kramer was the product
of a reasonable strategic decision, especially since Ohle has
failed to explain what evidence Kramer would have produced in
Ohle's favor while the Government has noted that it would have
elicited from Kramer that Ohle omitted material information when
responding to a Bank One internal investigation of the HOMER
transactions. See Gov. Opp. Br. at 30. Similar considerations
or, in some instances, the unavailability of the witnesses
compel the conclusion that Abrams' decision not to investigate
other witnesses was either reasonably strategic or not-
prejudicial.

One final aspect of Abrams' investigation requires a bit more discussion. Abrams conveyed to the Court during the Fatico hearing that, when Abrams contacted counsel for Jeff Conrad, an in-house lawyer at Bank One, he was told that Conrad would assert his Fifth Amendment privilege. Ohle's first habeas counsel states in her declaration that she contacted Conrad's counsel and was told that "Conrad did not assert his Fifth Amendment privilege in relation to this case." Declaration of Priya Chaudhry, ECF Dkt. No. 2, ¶ 6. But the fact that Conrad did not in fact assert his Fifth Amendment privilege in this case (because he was not required to) does not contradict Abrams' assertion, confirmed by the Government, that he informed all relevant parties that he would invoke the Fifth if necessary. See Gov. Opp. Br. at 29 n.5. Ohle's counsel, first or second, could easily have clarified any ambiguity in this respect, but chose not to. Absent some statement from Conrad or his counsel that he never informed Abrams or the Government that he would invoke his Fifth Amendment privilege if called to testify, it is clear that Abrams did not provide ineffective assistance in failing to interview Conrad.

Second, Ohle faults Abrams for allegedly not effectively cross-examining Paul Ferguson, who corroborated the Government's referral fee theory. According to Ohle, if Abrams had had a

15

better command of the facts of the case and underlying
documents, he could have disproved Ferguson's statements on
direct examination that (1) Bank One received its fees from
HOMER clients -- in reality, the clients paid J & G, which, in
turn, paid Bank One -- and (2) that the payment of referral fees
reduced the total amount of the fee that Bank One received.

Neither argument withstands scrutiny. There was never
any dispute at trial that HOMER clients first paid J & G and
then J & G paid Bank One. To the extent Ferguson's testimony can
be construed (artificially) as expressing that the clients paid
Bank One directly, this assertion would be incidental in any
event to the substance of his response to the question posed.
See Trial Tr. at 90:18-20 ("Q: How was the fee paid by the
client? A: The fee was paid in to different parties. Part of the
fee was paid to Bank One. Part of the fee was paid to a
subsidiary . . ."). Thus, even if Abrams had confronted Ferguson
on this point, it could have had only the most marginal effect
on Ferguson's credibility.

As for the accuracy of Ferguson's understanding of the
fee structure, Ohle's argument is simply too speculative. The
trial transcript shows that Ferguson's knowledge was based, at
least in part, on a conversation he overheard between Ohle and
Conrad in which they expressed "frustrat[ion] that Vicky Little

16

was giving too much away in referral fees on her transactions."
See Trial Tr. at 93:7-9. Ohle asserts that this was really a
conversation about a "Partnership Trade transaction" that Little
had mentioned when the Government interviewed her prior to
trial. See Davis Decl., Ex. 5, ¶ 19. Ohle's theory, however,
seems to be premised solely on the fact that the word
"transaction" was used in both instances. See Def.'s Condensed
Supp. Br. at 25-26. This argument thus imagines a standard for
ineffective assistance that would require an attorney to, in
essence, have a photographic memory of the record. Furthermore,
in the same interview (the notes from which could not, in any
event, be introduced into evidence), Little also referred to
HOMER as a "transaction." Id. ¶ 27. Thus, Abrams' cross-
examination was neither deficient nor prejudicial.

Third, Ohle attacks Abrams' representation on the ground
that Abrams did not appreciate the significance of IRS Form
1099s, which, as Ohle understands them, show that the referral
fees were J & G's property, not Bank One's.[2] These IRS forms

---

[2] The specific basis for Ohle's understanding is an IRS
information document request that instructed J & G to provide
the names of any "service providers" "paid out of the J & G
fee." J & G's response listed, among many others, the recipients
of the referral fees. Def.'s Condensed Supp. Br. Ex. 1-6. As
just stated in the discussion of Paul Ferguson's testimony,
however, there was no dispute that HOMER clients first paid a
fee to J & G and that J & G then distributed that fee to others,
including the beneficiaries of the fraudulent invoices and Bank

17

show only who made a payment and to whom that payment was made. In other words, the fact that J & G's name appears on a Form 1099 -- a fact not in dispute -- proves nothing about to whom J & G would have distributed those fees in the absence of any fraudulently submitted invoices, a fact hotly in dispute at trial, on appeal, and in the pending motions. Abrams' decision to focus, not on facts that were undisputed and incidental, but instead on the material matters in dispute was, it should go without saying, reasonable.

Fourth, Ohle criticizes Abrams for allegedly failing to take advantage of the "Services Agreements" that Bank One and J & G entered into for each HOMER transaction. As noted above, these Services Agreements included a fee to be paid to Bank One that matched what Bank One eventually received.[3] Ohle now argues that "Abrams should have presented readily available evidence to the jury that . . . [Bank One's] only property interests in HOMER fees were those set forth in J & G's Services Agreements." Def.'s Condensed Supp. Br. at 31. Notwithstanding Ohle's eagerness to hurl allegations at his former counsel, Abrams not

_____

One, which also appears on J & G's response to the IRS's request.

[3] The Government (backed up by the documentary records and witness testimony already discussed) argued that the Services Agreements reflected only the amount to which Bank One was entitled after deducting referral fees. The jury agreed.

18

only introduced the Services Agreements into evidence but also argued to the jury during his summation just what Ohle argues he should have argued: "[T]he one thing you have in writing are those service agreements between Bank One and [J & G] . . . and they set out how much Bank One is going to be paid for each Homer tax transaction." Trial Tr. at 2158:21-25.

Fifth, Ohle contends that Abrams provided constitutionally ineffective representation because he failed to argue that the Government should be required to prove that Bank One had a "legitimate" interest in the referral fees. Ohle's theory is that, since the HOMER transactions were themselves unlawful, so too were the proceeds that Bank One received for its participation. Therefore, Ohle concludes, Bank One could not have been defrauded of "property" to which it was entitled within the meaning of the wire fraud statute if the funds at issue were illegally generated. See 18 U.S.C. § 1343.

Once again, Ohle wrongfully accuses Abrams. The HOMER transactions were not proven unlawful until the Fatico hearing. Once they were, Abrams did, in fact, make the very argument on Ohle's direct appeal that Ohle claims was overlooked:

> Although the government argued that Bank One had a valid property interest in the "referral fees" related to the HOMER tax shelter, the government also argued during the Fatico hearing that HOMER was a thoroughly fraudulent transaction. As a matter of law, Bank One

19

> could not have had a valid property right in "referral
> fees" related to such a fraudulent transaction.

Brief of Defendant-Appellant, John B. Ohle III, at 35, United
States v. Ohle, 441 F. App'x 798 (2d Cir. 2011) (No. 11-393),
2011 WL 2321826. Unpersuaded, however, the Second Circuit
rejected the argument without discussion. See Ohle, 441 F. App'x
at 804 ("We have considered defendants' remaining arguments and
conclude that they are without merit."); cf. also United States
v. Thompson, No. 04 Cr. 1036(GEL), 2006 WL 1738227, at *2
(S.D.N.Y. June 23, 2006) (dismissing the same argument in the
context of Hobbs Act robbery as a "proposition . . . completely
without support."). Because Abrams raised the argument in a
timely fashion, Ohle cannot relitigate it now. See Barton v.
United States, 791 F.2d 265, 267 (2d Cir. 1986). To the extent
that Ohle means to argue that Abrams should have raised this
issue and offered supporting evidence during trial in the hopes
that this Court might have erroneously accepted a proposition
that the Second Circuit has now rejected, that cannot form the
basis of a successful claim of ineffective assistance.

Sixth, Ohle also asserts that Abrams' defense against
the Government's assertion that the invoices were "bogus" was
constitutionally ineffective. In particular, Ohle argues that
Abrams should have "present[ed]" three documents that would have

20

shown that the bogus invoices for referral fees were actually legitimate. See Def.'s Condensed Supp. Br. at 58.

None of these documents supports Ohle's cause, and Abrams therefore was not ineffective in failing to raise them. The first document was only produced to Ohle after trial (and this Court has already ruled that the late production was not prejudicial), compare Condensed Supp. Brief at 58 (citing Exhibit 16 to Ohle's Motion for New Trial) with Declaration of Stanley J. Okula, Jr. in Opposition to Defendants' Second Motion for a New Trial, United States v. Ohle, 08 Cr. 1109, ECF Dkt. No. 164, ¶ 3 ("Exhibit[] . . . 16 . . . [was] not previously produced to the defense prior to trial."), so it is impossible to see how Abrams could be faulted for not raising it during trial. The second document is Daugeras' notes. Because Daugeras was under indictment at the time, Ohle could not have reasonably called him to testify, and the Court does not see -- and Ohle offers no explanation -- how these notes could be admitted into evidence without him (or, indeed, even with him). The third document is an excerpt from the report that memorialized the results of an investigation into Ohle's handling of the Ames trust. Aside from being inadmissible hearsay, this report, authored by Ames' lawyer, John Wogan, did not bear on the invoices and is therefore immaterial to the issue.

21

Accordingly, the Court rejects each of Ohle's many arguments that Abrams provided ineffective assistance with respect to Ohle's conviction for conspiracy to commit wire fraud.

The Court now turns to Ohle's arguments related to the tax evasion counts. First, Ohle argues that Abrams provided ineffective assistance because he failed to adequately investigate whether the amounts that Ohle took from the Ames trust were legitimate loans that he intended to repay. Legitimate loans are not "income" for tax purposes, and Ohle contends that Abrams failed to pursue Ohle's suggestions of where to find proof that the transfers from the Ames trust at issue were part of a "tripartite loan" with entities called Gamma Trading Partners LLC ("Gamma") and Dalton Ventures ("Dalton"). See Def.'s Br. at 17; Def.'s Condensed Supp. Br. at 63. Ohle had been asked for these records years before being indicted when Ames conducted the above-mentioned investigation, but Ohle failed to produce them. As a result, his self-serving, post-conviction assertions that he told Abrams precisely where to find the records and that such records exist carries little weight.[4] Further, the Government issued its own subpoena to

---

[4] Ohle now offers the affidavit of the attorney who represented him when the Ames trust investigated his conduct and posits that this attorney would testify that the "loans" were legitimate.

22

Gamma, which yielded documents that Abrams tried but, as a result of this Court's evidentiary rulings, was unable to introduce at trial. Further still, Dalton is an entity owned by Ohle's family (his father-in-law is John Keane Dalton), and so if it had any relevant documentation, it would have produced it by now. In other words, Ohle would have the Court believe that, even though (1) Ohle failed to provide proof of the alleged legitimacy of the loans to the Ames trust before he was indicted,[5] (2) Dalton has not provided proof since, and (3) the Government's own investigation turned up nothing, Abrams' additional investigation would have uncovered a "smoking gun." The Court will not indulge Ohle's conjecture and concludes that Abrams' alleged lack of investigation did not result in any prejudice to Ohle.

---

Notably, however, the attorney does not aver that he saw any documentation for the "loans" or that Ohle did not take a 5% fee from the trust without any previous disclosure. In substance, he says only that "[a]ll financial matters of Ohle's administration of the Trust as Trustee from its inception were open for discussion." Petitioner Ohle's Supplemental Brief Regarding October 26, 2010 Deposition Of Denise Davila Brown, ECF Dkt. No. 55, Ex. C, Affidavit of John Rouchell, ¶ 6 (emphasis added).

[5] Ohle now states that he destroyed these records three years after his role in the Ames trust came to an end, see Condensed Supp. Br., Ex. B, Declaration of John B. Ohle III in Support of Petition, ¶ 14, but this averment leaves unexplained why Ohle failed to produce the documentation at the time the Ames trust initially investigated.

Second, Ohle argues that Abrams was ineffective for failing to offer evidence showing that Brown, the third-party purchaser, perjured himself. Ohle focuses specifically on Brown's testimony at trial that (1) to act as the third-party purchaser, he was required to use cash to purchase the unitrust interest, (2) Ohle directed Brown to misrepresent to Daugerdas that Brown had cash to make the purchase, and (3) Ohle directed Brown to conceal that the two were splitting the fee that Brown received in return for acting as a third-party purchaser. See Def.'s Condensed Supp. Br. at 56-57. This testimony, Ohle asserts, is undermined by evidence that Abrams should have used to show that Brown originally contemplated using notes, rather than cash, to make the requisite purchases and that it was actually people at J & G, not Ohle, who directed Brown.[6]

At the outset, the Court notes that the majority of the evidence on this point that Ohle describes in his briefing is either unsupported by citation or supported by a citation that does not stand for the proposition cited. See Condensed Supp. Br. at 56-58. But even if the Court accepts Ohle's characterization of the evidence that he suggests Abrams should

---

[6] Although Ohle does not precisely connect the dots, the Court understands him to be arguing that this showing would undermine the Government's argument that Ohle had a motive to embezzle from the Ames trust.

24

have employed, it would not have undermined Brown's testimony,
and so Abrams' performance cannot be said to be deficient on
this score. Although Ohle casts the fact that Brown originally
contemplated using notes instead of cash as an idea unfamiliar
to these proceedings, Brown testified on direct that
"[i]nitially [he] believe[d] it was supposed to be just
promissory notes that . . . were going to [be] use[d] to do the
transactions and at some point . . . it was decided there would
be a cash component of that also." Trial Tr. at 532:11-15. As
for the direction that Brown allegedly received from J & G,
Brown testified to this too. See, e.g., Trial Tr. at 534:11-14
(testimony from Brown explaining that he received documentation
from J & G and it was his "understanding they [J & G] prepared
[the documentation] and they made those decisions"). Regardless,
the fact that Brown interacted with J & G does not undermine his
testimony that he had an undisclosed fee-sharing arrangement
with Ohle.[7]

_____

[7] Ohle also argues that the deposition testimony of Denise Brown,
Ken Brown's wife, in a civil case contradicts Ken Brown's
testimony at trial and that Abrams should have interviewed her
as well. However, the portions of the deposition that Ohle cites
generally concern what Ken Brown had told Denise Brown about
certain meetings she did not personally attend. In other words,
her testimony would be hearsay. Further, for the same reasons
just stated above, Denise Brown's testimony was not actually
inconsistent with Ken Brown's trial testimony. Ohle also asserts
that Denise Brown's statement that the Browns continued to
participate in HOMER transactions after Ohle stopped shows that

25

Third, Ohle claims that Abrams' cross-examination of Steger was constitutionally deficient and prejudicial. The following passage best illustrates the force of Ohle's arguments as to Abrams' handling of Steger:

> Abrams' failure to investigate resulted in his inability to confront Steger's false claims with his direct prior statements to Wogan. Had Abrams obtained the forensic accountant's report from Citron Cooperman, Abrams would have shown that Steger obtained $920,000 from Invested Interest [GX 73-1-D1] of which he transferred $600,000 to Dalton Ventures [GX 73-1-E6]. The difference of $320,000 plus the original $50,000 that Steger sent to his broker-dealer Chicago Investment Group [Tr. 1091] represented the entire $350,000 SocGen warrant commission. Instead, Steger testified that Ohle received the SocGen warrant commission AND the "bogus referral fee" from J&G.

Condensed Supp. Br. at 67 (alterations in original). The portion of the transcript that Ohle cites (page 1091) contains Steger's testimony on direct examination, which means that Ohle's argument boils down to an assertion that Abrams provided ineffective assistance because he failed to introduce the very evidence that the Government used to support its own case.

Ohle also suggests that Abrams should have recovered checks that Steger allegedly forged. Assuming, arguendo, that the checks Ohle now has in his possession are actually forged, Abrams cross-examined Steger about this, and Steger denied

_____

there were multiple conspiracies, but Brown's after-the-fact conduct cannot undermine the proof at trial as to the existence of an agreement during the relevant time period charged.

making any forgeries. It would have been a poor use of time for Abrams to attempt to prove the forgery through other means, and even if he had, the evidence would have been subject to exclusion. United States v. Purdy, 144 F.3d 241, 245-46 (2d Cir. 1998) ("Extrinsic evidence offered for impeachment on a collateral issue is properly excluded.").

Fourth, Ohle challenges Abrams' performance related to the Government's charge that Ohle's participation in the 1256 tax shelter was unlawful. Though the precise mechanics of the shelter are not relevant here, some additional background helps frame the discussion. The 1256 transaction involved the pairing of certain offsetting foreign currency trades. As a general matter, if such paired transactions can be "separated," then a person in Ohle's shoes faces a substantial, and real, risk of loss; if, however, they cannot be separated, then a participant's actual risk of loss is quite low. A taxpayer can enjoy certain benefits in the former situation.

Here, it is undisputed that the transactions could not be separated. At the same time, however, Ohle signed a representation letter stating that they could be separated; he gave that representation letter to Jay Gordon, a lawyer at Greenberg Traurig; and Gordon then authored an opinion expressing that the shelter was legal. Ohle asserts that he was

27

ignorant of the falsity of the representation letter and his
reliance on Gordon's opinion letter shows that he did not
willfully evade the tax laws in reporting a high risk of loss.
The Government, however, presented evidence, primarily, though
not solely, through John Kruse, a trader at the Royal Bank of
Canada who helped structure the shelter, that demonstrated that
Ohle and other participants shared an "understanding" that the
trades could be separated and that Ohle had this understanding
before he signed the representations he later presented to
Gordon. See Trial Tr. at 1511:25-1512:3.

Ohle's ineffective assistance argument on this issue
proceeds as follows. First, Ohle asserts that Abrams did not
adequately cross-examine Kruse. Specifically, although Kruse
testified that the participants in the shelter had an
"understanding" that the trades would not be separated, he has
since testified, in a separate civil matter, that he was unaware
that Montgomery Global Advisors ("Montgomery"), which served as
the counterparty on the transactions at issue, authored its own
representation letter stating that the trades could be
separated. Ohle suggests that confronting Kruse with this
document would have called his testimony into doubt. Second,
Ohle asserts that Abrams should have secured the testimony of
Roger Groh, Montgomery's investment adviser, who, Ohle implies,

28

would have testified about Montgomery's representations. Third, with this evidence in hand, Ohle contends that Abrams would have been able to argue that Ohle's representations to Gordon (the Greenberg Traurig lawyer) were made in good-faith reliance on Montgomery's representations and did not involve, contrary to Kruse's testimony (who, in Ohle's imagining of events, would now be discredited), any undisclosed "understanding" otherwise.[8]

The Court is not persuaded. To start, the Court agrees with the Government that Ohle's theory carries little weight when viewed in light of testimony from Brown and Steger -- which Ohle entirely ignores -- that Ohle informed them that entering into the 1256 shelter would have the effect of exaggerating their losses and, in the words of Brown, "offset[ting] the tax liability for the year 2002." Trial Tr. at 563:6-17 (testimony

---

[8] Ohle faults Abrams for not interviewing other participants in the 1256 shelter as well, but with one exception, he offers no basis for saying that Abrams would have learned any pertinent information from making such inquiries. As the Court stated at the outset of this opinion, a showing of prejudice requires more than speculation. As to the exception, Ohle notes that Abrams did not interview a lawyer who, according to Ohle, "would have testified that the IRS [in an earlier investigation] did not find that Ohle or his company were criminally culpable and that Ohle cooperated fully with the IRS." Def.'s Condensed Supp. Br. at 71. Assuming, arguendo, that this witness would have so testified, the absence of such testimony was not prejudicial in light of the reality that its force would be substantially undercut by the very fact that Ohle was, regardless of what the IRS had previously concluded, standing trial for his participation in the shelter.

of Brown); id. at 1157:4-6, 1159:9-11 (testimony of Steger).
This establishes that, regardless of what Montgomery's
representation letter stated, Ohle had knowledge (and shared
that knowledge) of the fact that the shelter would inflate his
losses. Thus, it is against not only Kruse's testimony, but also
Brown's and Steger's that Groh might have testified -- though he
never said anything to this effect when interviewed by the
Government -- that he represented to Ohle that the trades could
be separated and that Groh and Ohle had no other understanding
on the side. Furthermore, the Court notes that the
representation letter from Montgomery is dated October 2003, but
Kruse testified that he and Ohle discussed how the transaction
would work throughout 2002. See Trial Tr. at 1496:2-23. That
being the case, the Court does not see how Ohle could have
relied on Montgomery's representations in good faith. Rather,
what the Montgomery letter would seem to show, if anything, is
that Ohle tried to cover his tracks not just on the back end
(the Greenberg Traurig opinion letter), but on the front end as
well (the Montgomery representation letter).

        The remainder of Ohle's arguments, of which there are
four, are perhaps best put into the category of miscellaneous.
First, Ohle asserts that Abrams should have confronted Hugh
Uhalt, the son of Ecetra Ames, with documents that would have

                                30

shown he was offering false testimony. Uhalt, as relevant here, testified that he had power of attorney from his mother to investigate Ohle's conduct as trustee and that Ohle's conduct as trustee was improper. It is undisputed that, in a recent deposition in a civil case, Uhalt admitted that he testified falsely about his power of attorney.

Abrams' performance was not deficient as to either issue. With respect to Uhalt's testimony about having power of attorney, the point was only a collateral one that, on its own, established nothing.[9] And, even without using documents to impeach Uhalt, Abrams' cross-examination was so effective that the Court, on its own initiative, called a sidebar to inform Abrams that he would be permitted to argue to the jury that Uhalt had simply lied. See Trial Tr. at 739:15-18. As for Uhalt's statements about the impropriety of Ohle's conduct as trustee, Uhalt testified only (1) that he asked Ohle about the basis for the 5% fee that Ohle took when he invested funds from the Ames trust into Carpe Diem and (2) that Ohle was unable to produce the underlying documentation for the various transfers

---

[9] Although Ohle suggests that, without power of attorney, Uhalt could not have had personal knowledge of Ohle's conduct with respect to the Ames trust (thereby making his testimony hearsay), nothing in the record supports that assertion. To the contrary, the record shows that Uhalt had sixteen phone calls with Wogan, who was a trustee, during the relevant time period. See GX 30-46.

31

of trust money he had directed. See Trial Tr. at 727:24-25,
729:1-4. None of the evidence to which Ohle now points undercuts
either of these assertions. Indeed, one of the primary documents
on which Ohle relies, Wogan's report, supports (to the extent
hearsay can) Uhalt's testimony. See Condensed Supp. Br., Ex. 2-
1, at 5-6 (expressing the lack of a "good answer for the
authorization of the 5% fee" and citing Ohle's inability to
produce "copies of the disclosure to Mrs. Ames and the Trust
that this investment involved a 5% fee").

   Second, Ohle asserts that Abrams rendered
constitutionally ineffective assistance by failing to present
evidence during the Fatico hearing that showed that Ohle lacked
knowledge of the illegality of the HOMER transactions. Even
assuming that Ohle is correct that Abrams could have offered
evidence to negate Ohle's knowledge of the illegality of the
HOMER transactions in general, as this Court explained when it
issued its decision after the Fatico hearing, "Ohle funded,
utilized, and controlled a confederate, Ken Brown, to pose as
the requisite 'unrelated third-party' in each HOMER transaction.
This itself rendered the HOMER tax shelter fraudulent as to
those transactions." See United States v. Ohle, 08 Cr. 1109,
Findings & Conclusions Regarding "Relevant Conduct," ECF Dkt.
No. 151, at 3.

32

Third, Ohle claims that Abrams failed to investigate
Ohle's assertion that he was actually a whistleblower and that
Bank One used him as a scapegoat to avoid criminal prosecution.
This is, of course, news to the Court and the Government alike.
In the intervening half decade between Ohle's dismissal from
Bank One and the Indictment filed in this case, Ohle never blew
any whistles, and even his original pro se habeas petition makes
no mention of this fact. Suffice it to say that nothing supports
this interpretation of history beyond Ohle's self-serving
declaration.

Fourth, Ohle argues that, even if none of Abrams'
alleged errors individually prejudiced him, together, the errors
cumulatively satisfy the Strickland test. Because, however, the
Court has concluded that none of Abrams' alleged errors harmed
Ohle at all, their collective impact also falls short of showing
that there is a "reasonable probability that but for" Abrams'
alleged errors, "the result of the proceeding would have been
different." Pham v. United States, 317 F.3d at 182.

Apart from his claims of ineffective assistance, Ohle makes
a number of discovery requests, each of which the Court now
denies.

33

Ohle will not be permitted to issue a subpoena to the IRS. For the reasons stated above, the materials Ohle desires to obtain from the IRS are not material.

Nor will the Court require the Government to produce another set of electronic discovery to Ohle. The Government represents that it has offered to make a technical advisor available to Ohle to address Ohle's concerns, but that Ohle has failed to take advantage of the opportunity. See Government's Memorandum of Law in Response to Defendant Ohle's Request for Discovery, ECF Dkt. No. 42, at 7 n.5. Ohle, despite being given leave to file a reply brief after the Government made this representation, does not deny this. That being the case, Ohle has not made a sufficient showing (assuming one could be made at this stage) that the Government should be required to produce yet another set of discovery.

Ohle also will not be allowed to subpoena documents held by third parties who performed services for which Ohle has not paid. Cf. The Flush, 277 F. 25, 30-31 (2d Cir. 1921). The Court likewise denies his request to issue a subpoena to his former habeas counsel, who now asserts an attorney's lien over his files. Ohle's demand for all his previous files is too broad; he must make a "particularized showing" of what he needs in his files and why. Pomerantz v. Schandler, 704 F.2d 681, 683 (2d

34

Cir. 1983). The Court understands his current habeas counsel to have a copy of the electronic discovery files, see Ohle Memorandum in Support of Motion to Permit Discovery and to Allow Him to Secure His Files from His Previous Attorneys, ECF Dkt. No. 41, Ex. 5, and those files, without further guidance from Ohle, strike the Court as the most important materials in this case.

And Ohle certainly will not be allowed to subpoena Abrams' medical records. Given that the Government's briefing (filed before Ohle made this request) demonstrated that an attorney's poor health does not change the Strickland analysis, Ohle's decision to move forward with this request baffles the Court.

To summarize, for the foregoing reasons, the Court denies Ohle's motion to vacate his sentence and conviction, and his requests for discovery. The Court also denies Ohle's alternative request for an evidentiary hearing as he has failed to "proffer arguably credible evidence of a prima facie case" of entitlement to relief. See Puglisi v. United States, 586 F.3d 209, 215 (2d Cir. 2009).

      SO ORDERED.

Dated: September  , 2015
       New York, New York       JED S. RAKOFF, U.S.D.J.

35